## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CONNIE M. WILDE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-CV-486-GKF-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Claimant, Connie M. Wilde ("Wilde"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Wilde's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Wilde appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled. This case has been referred to the undersigned. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

### Claimant's Background

Wilde was 52 years old at the time of the hearing before the ALJ on January 12, 2012. (R. 47). She had graduated from high school and had an Associate of Arts Degree in Farm and Ranch Management. (R. 48).

Wilde testified that she had pain in her lower back and hands, and she had stomach problems, hearing problems, and depression. (R. 55-56). She had high blood pressure for which she took medication. (R. 57). Wilde thought that she had experienced a stroke in the past, when one side of her face was paralyzed for a few days. (R. 58). Wilde said that she experienced some confusion with reading and writing and she often had to reread things. (R. 48, 73). Wilde said that her medication helped with her stomach problems, but she got nauseated and sometimes threw up throughout the day. *Id.* Her stomach problems were caused by a hiatal hernia and acid reflux. *Id.*

Wilde thought that her problems with her hands were caused by arthritis, and she said that her hands were uncomfortable and didn't work very well in the morning. (R. 59). In response to a question from the ALJ, Wilde said that she would be able to feel and to pick up poker chips. *Id.* Wilde did not wear a hearing aid. (R. 60). She stated that she did not have to use any sort of aid to use the telephone, but she did turn the volume to the highest setting. *Id.*

Wilde said she had back pain caused by arthritis, a bulging disc, and degenerative disc disease, and the pain sometimes kept her from doing anything other than sitting or lying down. (R. 60-61). She had not had back surgery, nor had any been recommended. (R. 61). Wilde stated that she could bend over to touch her knees, but probably not her toes. *Id.* She could squat slowly, and she could go up and down a flight of stairs. (R. 62). Wilde said that she would have difficulty reaching behind her. *Id.* She stated that she would have difficulty lifting a twenty pound bag of potatoes off the floor. (R. 63). Wilde said that she could sit for fifteen to twenty minutes before feeling uncomfortable and needing to stand. *Id.* She could stand about the same amount of time. *Id.* She stated that she could walk two hundred feet. *Id.* Wilde thought that cold and damp worsened her conditions. (R. 64-65).

Wilde said that she suffered depression and anxiety. (R. 65). She took medication, which helped, and she was not attending counseling. *Id.* Wilde said that she did not think that she had problems getting along with people, but she could go up to two weeks without seeing anyone. (R. 66). Wilde stated that she had problems with memory and she would forget why she had gone into a room, she occasionally forgot about food on the stove, and she had trouble remembering where she left her car in a parking lot. (R. 65). She said that she sometimes had trouble getting to sleep and she usually got between four and six hours of sleep a night. (R. 70). She had a driver's license, and she drove forty miles in an average week. (R. 62). She said she had to get out of the car slowly and hang on to the car to orient herself. (R. 71).

Wilde stated that she did not have a problem with substance abuse and she did not use illegal drugs. (R. 66-67). She stated that she drank alcohol two or three times a week at night when her pain medication was not working. *Id.* Wilde said that some of her medications made her feel sleepy and disoriented. (R. 67). She regularly used a heating pad to relieve her symptoms. *Id.* Wilde had previously done water aerobics for three or four months which had provided her with temporary relief for a few hours each day. (R. 68). She washed dishes and did laundry, occasionally cooking, sweeping, dusting, and vacuuming. *Id.* Wilde attended family get-togethers about every three or four months. (R. 69). She tended flowers in containers on her porch. *Id.* Wilde said that she mowed her lawn with a riding mower. (R. 70).

Wilde saw Paul R. Webb, M.D., as a new patient on June 25, 2008 and stated that she was fatigued all the time and had elevated blood pressure. (R. 225-27). She had previously been prescribed medication for high blood pressure, but she had soon stopped taking it to avoid the trouble of going to check-ups. (R. 225). She reported smoking one-and-a-half packs of cigarettes per day and occasionally drinking alcohol. (R. 226). Wilde reported myalgias in her

3

hands and shoulders.  *Id.*  She was described as alert and oriented.  *Id.*  Wilde was diagnosed

with benign essential hypertension and fatigue.  (R. 225-26).  She was prescribed Lisinopril.  (R.

227).  On August 12, 2008, Wilde saw Dr. Webb again to review lab reports.  (R. 228-31).  He

advised Wilde to follow a low-fat, low-cholesterol diet, improve her exercise patterns, and quit

smoking.  (R. 231).

Wilde saw Dr. Webb again for a follow-up appointment on December 15, 2008.  (R. 232-

35).  He wrote that Wilde had been experiencing back pain off and on since she was twenty years

old.  (R. 233).  Due to the pain, she was no longer very active.  *Id.*  Wilde said that alcohol

relieved the pain.  *Id.*  Dr. Webb stated that Wilde was positive for depression but negative for

suicidal thoughts.  *Id.*  She had both anxiety and insomnia.  *Id.*  Wilde weighed 208 pounds.  *Id*

On examination, Dr. Webb found tenderness of Wilde's lumbar back.  (R. 234).  Dr. Webb listed

Wilde's diagnoses as benign essential hypertension, mixed hyperlipidemia, fatigue, and back

pain.  *Id.*

At a follow-up appointment on April 15, 2009, Dr. Webb noted that Wilde complained of

fatigue and lightheadedness.  (R. 236-38).  Prozac was making her less jittery, but she still felt

depressed.  (R. 236).  Her back was better following a visit to a chiropractor.  *Id.*  Wilde reported

insomnia, saying that she was up a lot at night and woke up tired in the mornings.  (R. 237).  Dr.

Webb stated that her fatigue might be caused by depression, menopause, or sleep apnea.  (R.

238).

Records from Community Health Associates dated May 22, 2009, stated that Wilde had

constant pain in her lower back.  (R. 215-17).  She was taking Vicodin for the pain, and she had

tried Tylenol, ibuprofen, and heat.  (R. 215).  Wilde had gone to a chiropractor six weeks earlier

and was told to do leg lifts and sit ups, but she was unable to do sit ups.  *Id.*  Wilde had high

blood pressure, night sweats, and depression.  *Id.*  In addition to the Vicodin, Wilde was

prescribed Lisinopril and Prozac.  *Id.*  Lumbar spine x-rays completed the same day showed

degenerative changes with disc space narrowing at the L5/S1 level and mild anterior osteophyte

formation involving the L2/L3 disc without disc space narrowing.  (R. 217).  There were mild

degenerative changes involving the facet joints at L4 and L5 levels on the left side, but no

spondylolysis and no findings regarding paraspinal soft tissues.  *Id.*

Wilde saw Dr. Webb again on June 15, 2009, complaining of high blood pressure.  (R.

239-41).  She was depressed, tired all the time, and suffering from back pain constantly.  *Id.*  She

weighed 192 pounds.  (R. 240).  Wilde was prescribed Lisinopril and fluoxetine.  *Id.*

A magnetic resonance imaging ("MRI") procedure of Wilde's lumbar spine was

completed on June 25, 2009.  (R. 250).  There was a "marked disc space narrowing with

prominent reactive degenerative change" at the L5/S1 level that was characterized as "far

advanced" degenerative disc disease.  *Id.*  The L4/L5 disc was normal in height "with diminished

signal."  *Id.*  The L5/S1 level also had mild left-sided disc bulging and spondylosis with mild

left-sided foraminal narrowing.  *Id.*

Wilde apparently was seen at Northeastern Tribal Health Systems (the "Miami Clinic")[1]

on July 20, 2009 as a new patient with a chief complaint of chronic low back pain.  (R. 267-72).

It appears that Tylenol #3, Flexeril, naproxen, enalapril, and fluoxetine were prescribed.  (R.

268).  Wilde saw the same care provider again on August 17, 2009, and September 3, 2009.  (R.

265-66).

---

[1] Northeastern Tribal Health Systems appears to have more than one location, but for ease
of reference, the undersigned will refer to them all as the Miami Clinic.

Following a referral, Wilde had a neurosurgical evaluation on November 18, 2009, with Hani J. Tuffaha, M.D. (R. 253-54). Dr. Tuffaha said that Wilde described lower back pain and bilateral leg pain, down into the shins, of equal intensity. (R. 253). She was taking Prozac, enalapril, and naproxen. *Id.* Examination of the lower back revealed full range of motion, but Wilde experienced pain on maximum flexion. *Id.* Straight leg raising to 90 degrees, in the seated position, resulted in no difficulty. *Id.* Her gait was unremarkable and she changed positions cautiously. *Id.* Dr. Tuffaha diagnosed Wilde with intractable pain syndrome involving lower back and both legs, of unclear etiology, and degenerative disc disease at L5/S1 "of possible limited significance." (R. 254). Dr. Tuffaha stated that there was no indication for neurosurgical management. *Id.*

Wilde was seen at the Miami Clinic by James H. Tiemann, M.D., on April 9, 2010, for continued care for her chronic back pain. (R. 256-63). She was started on a trial of gabapentin, and her other medications were renewed.

Wilde went to appointments at Miami Chiropractic Clinic, Inc., on June 25, June 30, July 7, and August 4, 2010. (R. 298-99). Scott B. McKinney, D.C., signed a letter dated September 17, 2010 for purposes of Wilde's disability application. (R. 298). He stated that "examination revealed restricted range of motion and subluxation involvement to region affecting gait mobility and daily activity levels." *Id.* McKinney stated that Wilde had been improving with treatment. *Id.*

Wilde saw Dr. Tiemann on February 18, 2011, and she said that she was having increased pain that was not well controlled by 15 mg of morphine. (R. 355-56). Dr. Tiemann increased her morphine to 30 mg. (R. 356). On April 13, 2011, Wilde saw Dr. Tiemann at the Miami Clinic for a follow-up of her chronic back pain . (R. 346-47). Dr. Tiemann noted that radiology

reports indicated a small hiatal hernia, reflux to the thoracic esophagus, and esophagitis. (R. 347).

Wilde saw Dr. Tiemann on October 31, 2011 for follow-up of her high blood pressure and her back pain. (R. 312-14).

Wilde went to Cherokee Nation Health Services on November 28, 2011 to establish care for her lower back pain. (R. 385-86). The doctor's note states that Wilde left without being examined when she was told that the clinic did not have MS Contin on formulary. (R. 386). Wilde said that she would continue to go to the Miami Clinic. *Id.*

Wilde attended the Miami Clinic on January 30, 2012 to establish care with a new provider. (R. 440-43).

Wilde went to Cherokee Nation Health Services on February 7, 2012 "to find someone to treat" her chronic low back pain. (R. 413-15). The provider said that the clinic could not give Wilde chronic pain care, but could treat her other conditions. (R. 415).

Wilde presented to the Miami Clinic on March 14, 2012, crying and complaining of severe back pain. (R. 436-38). Her pain medications were adjusted. (R. 437). On June 5, 2012, Wilde was seen for a routine check-up at the Miami Clinic. (R. 431-33). Wilde reported that she continued to have low back pain that was severe enough that she could not live with it. (R. 431). It appears that the physician gave Wilde a corticosteroid injection and a prednisone dose pack and started Wilde on a trial of Flexeril. (R. 433). He adjusted her other oral pain medications. *Id.* A note stated that he wanted to review Wilde's previous records to consider further testing or referral for neurology or pain management. *Id.*

Wilde presented to the Miami Clinic on September 12, 2012 for her chronic back pain, which she said was a seven on a scale of one-to-ten. (R. 424-26). Wilde reported that she had

started to experience numbness on the inside on her left leg from ankle to knee. (R. 424). Her pain medications were again adjusted. (R. 426).

Wilde attended a check-up on October 31, 2012, at Cherokee Nation Health Services. (R. 410-12).

Wilde had an MRI of her lumbar spine performed on December 12, 2012, at Craig General Hospital. (R. 417). At the L5/S1 level, Wilde had mild degeneration of the disc without evidence of nerve root compression with mild-to-moderate degenerative changes of the facets. *Id.* At the L4/L5 level, there were moderate degenerative changes of the facets, and the disc appeared unremarkable. *Id.*

Agency consultant Saad M. Al-Shathir, M.D., completed an evaluation of Wilde and a report dated July 28, 2010. (R. 281-82). On examination, Dr. Al-Shathir found that straight leg raising was accompanied by low back pain. (R. 281). Wilde had tenderness "in the lumbosacral junction" with full range of motion of her spine and limbs. *Id.* Dr. Al-Shathir stated his diagnoses as chronic low back pain secondary to degenerative disc disease "with no significant neurologicl deficit or loss of range of motion; history of hypertension; and claimed depression. *Id.* Under the heading of "function evaluation," Dr. Al-Shathir stated that Wilde could read, write, sit up, reach, bend, manipulate objects with her hands, drive, do her shopping, and reach above her head. *Id.* She was able to bend and lift twelve-and-a-half pounds from the floor. *Id.*

Agency consultant Stephen Hoyer, Ph.D., completed a psychological evaluation of Wilde on July 23, 2010. (R. 275-78). Wilde initially stated that she was unaware of any psychological symptoms, and she was confused as to why she had the interview. (R. 275). Dr. Hoyer stated that it was apparent Wilde was somewhat depressed, and he wrote that her symptoms included depressed mood, anhedonia, social withdrawal, and feelings of worthlessness. *Id.* Wilde

reported that she had a problem with alcohol abuse when she was younger, but she only drank socially at the time of the evaluation. (R. 275-76). Dr. Hoyer stated that Wilde's concentration skills were very good, her memory was good, she had adequate judgement, and she had no thought disorders in evidence. (R. 276-77). On Axis I,[2] Dr. Hoyer diagnosed Wilde with depressive disorder, not otherwise specified. (R. 277). Dr. Hoyer mentioned that Wilde stated she would very much like to continue working and she had greatly missed it while being unable to work. (R. 278).

A Psychiatric Review Technique form was signed by Carol L. Adams, Psy.D., on August 3, 2010. (R. 283-95). Dr. Adams stated that Wilde's mental impairments were not severe. (R. 283). Dr. Adams stated that Wilde had depressive disorder, not otherwise specified. (R. 286). For the "Paragraph B Criteria,"[3] Dr. Adams indicated that Wilde had no restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 293). In the narrative section, Dr. Adams noted that Wilde did not allege mental impairments, but was taking medication for depression, which Dr. Adams thought was mostly related to her physical pain. (R. 295).

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Richard Hastings, D.O., completed an Internal Medicine Diagnostic and Therapeutic Consultation of Wilde on May 10, 2012. (R. 392-407). On examination, Wilde's grip strength was found to be thirteen kilograms in her right hand and ten in her left. (R. 400, 402). Examination of the hands revealed pain over the wrist and over the MCP, PIP, and DIP joints of the fingers. (R. 399, 401). In Dr. Hastings' opinion, Wilde had moderate to severe lumbosacral discogenic lumbar spine pain syndrome with radiculopathy; hypertension; GERD with peptic acid disease; hearing loss; osteoarthritis of the hands and fingers; major clinical depression with anxiety; and fatigue. (R. 403). In his opinion, Wilde was restricted to lift or pull no more than eight pounds repetitively; sit or stand for no more than twenty minutes; no climbing ladders; no climbing stairs repetitively; and no overhead work activities. (R. 404). Wilde would need to avoid repetitive activities of grasping, fingering, and assembly line type duties; avoid repetitive forceful turning and twisting of the hands; and avoid vibratory and pneumatic tools. *Id.* Due to fatigue, Wilde would be limited to no more than three-to-four hours of potential employment activities in a day. *Id.* Due to depression, she had mild to moderate limitation in maintaining customary social functioning; mild to moderate difficulty maintaining concentration, persistence, or pace; and moderate to marked limitation in her ability to complete a normal work day and work week without interruptions for psychologically based symptoms. *Id.*

## Procedural History

Wilde filed her application for disability insurance benefits on April 6, 2010. (R. 137-40). Wilde asserted onset of disability on January 1, 2008. (R. 137). The application was denied initially and on reconsideration. (R. 88-90, 96-99). An administrative hearing was held before ALJ Gene M. Kelly on January 12, 2012. (R. 41-83). By decision dated February 27, 2012, the ALJ found that Wilde was not disabled. (R. 18-30). On June 4, 2013, the Appeals Council

denied review. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final

decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[4] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation

and quotation omitted).

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Wilde met insured status requirements through June 30, 2011. (R. 20). At Step One, the ALJ found that Wilde had not engaged in any substantial gainful activity since her alleged onset date of January 1, 2008 through her last date insured of June 30, 2011. *Id.* At Step Two, the ALJ found that Wilde had severe impairments of lumbar degenerative disc disase, arthritis of the bilateral hands, small hiatal hernia, acid reflux, esophagitis, hearing impairment, depression, and substance abuse. *Id.* At Step Three, the ALJ found that Wilde's impairments did not meet any Listing. (R. 21-22).

The ALJ found that Wilde had the following RFC:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally, and 10 pounds frequently; stand and/or walk six hours in an eight hour work day at two-hour intervals; and sit six hours of an eight hour work day at four-hour intervals. She could occasionally bend, stoop, climb, squat, kneel, crouch, and crawl. She could occasionally reach behind, and had a slight limitation in fingering, feeling, and gripping such that she should not be doing extensive amounts of small, tedious tasks with her hands, such as working with very small nuts and bolts. She must work in a low noise environment. She could tolerate routine, ordinary business, education, and commercial-type noise

and light, but she should not work around noisy equipment or shop noise. She must avoid a cold and damp environment. She could perform only simple, repetitive, routine work. She has mild to moderate chronic pain which was noticeable to her at all times, but she would be able to remain attentive and responsive in a work setting, and could satisfactorily carry out normal work assignments. Medications for relief of symptomatology would not preclude light and sedentary work, and the claimant would remain reasonably alert to perform required functions in the work setting. She would find it necessary to alter position from time to time to relieve her symptomatology. In other words, she can perform less than the full range of "light" work. (20 CFR 404.1567(b)).

(R. 22). At Step Four, the ALJ determined that Wilde could return to past relevant work. (R. 28). As an alternative finding at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Wilde could perform, taking into account her age, education, work experience, and RFC. (R. 29). Therefore, the ALJ found that Wilde was not disabled at any time from January 1, 2008 through June 30, 2011. *Id.*

## Review

Wilde articulates her first point on appeal as an assertion that the ALJ erred at Steps Four and Five. Plaintiff's Opening Brief, Dkt. #19, p. 2. Under this general point, Wilde asserts several arguments. Her second assertion is that the ALJ failed to properly weigh medical and nonmedical opinion evidence. *Id.* Finally, she asserts that the ALJ's credibility assessment was insufficient. *Id.* Regarding the issues raised by Wilde, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. The undersigned therefore recommends that the ALJ's decision be **AFFIRMED**.

### The Significance of Dr. Hickman's Opinion Evidence

The ALJ held a hearing with Wilde on January 12, 2012, and Exhibits 1A through 14F were admitted into evidence at that time. (R. 44-45). The ALJ also indicated that two additional documents submitted by Wilde would be made part of the record and probably numbered Exhibit

15F and Exhibit 16F. *Id.* After the hearing, the ALJ issued his unfavorable decision dated February 27, 2012.

Wilde then obtained a consultative examination and report from Dr. Hastings dated May 20, 2012. (R. 392-407). When the Appeals Council denied review of the ALJ's decision on June 4, 2013, it made Dr. Hastings' report part of the record. (R. 1-5).

The Tenth Circuit has recognized that a reviewing court "must consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented." *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006). The undersigned emphasizes that Dr. Hastings' report will only be considered "on the issues presented" by Wilde. Wilde has not made a general argument that Dr. Hastings' opinion evidence robs the ALJ's decision of support by substantial evidence and instead has only referred to Dr. Hastings' report in connection with specific arguments. This Court's review is limited only to those issues sufficiently developed by Wilde. All issues not raised by Wilde or not sufficiently developed for meaningful review are waived. *Wall*, 561 F.3d at 1066 (claimant's argument at the district court was "perfunctory," and deprived that court of the opportunity to analyze and rule on that issue); *Sullivan v. Colvin*, 519 Fed. Appx. 985, 987 (10th Cir. 2013) (unpublished) (affirming lower court's finding of waiver on credibility issue).

Moreover, the undersigned has concerns about Wilde waiting until the ALJ had reached his unfavorable decision to undergo a consultative examination. The Tenth Circuit has expressed concerns in a case with a different procedural posture than Wilde's case. *Wilson v. Astrue*, 602 F.3d 1136, 1148-51 (10th Cir. 2010). In *Wilson*, the claimant submitted letters from a therapist dated after the denial of the Appeals Council to the district court. *Id.* at 1148-49. The Tenth Circuit said that the claimant had failed to show why she could not have obtained and submitted

the letters earlier, and therefore she had failed to show good cause for a remand. *Id.* at 1149-50.

The court's concerns echo here:

> Allowing a claimant to hold opinion evidence as to her limitations to present to the district court in the first instance would seriously undermine the regularity of the agency process and is not allowed.

*Id.* at 1149.

Wilde's case differs from the facts of *Wilson* in that she did submit Dr. Hastings' report to the Appeals Council. The undersigned, nevertheless, has concerns with a tactic of waiting until after an ALJ has given an unfavorable decision to seek a consultative opinion. Delay in seeking to develop favorable evidence would undermine the agency process and could cause numerous remands to the ALJ or appeals to the district court that could have been avoided had the evidence been available for consideration by the ALJ at the time of the hearing. *See also Maes v. Astrue*, 522 F.3d 1093, 1096-97 (10th Cir. 2008) (refusing remand to develop record when claimant's attorney did not seek records before hearing with ALJ and had told ALJ that record was complete). In Wilde's case, there appears to be no reason why she could not have consulted Dr. Hastings before the hearing with the ALJ.

The Commissioner did not raise the issue addressed by *Wilson* in connection with Wilde's case. The undersigned, without benefit of full briefing by the parties, will not address Wilde's delay in seeking the opinion of Dr. Hastings further than the concern noted above.

**Issues at Step Four and Step Five**

Wilde's first assertion under this general heading is that the ALJ failed to make the three-phase inquiry required at Step Four by *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). Plaintiff's Opening Brief, Dkt. #19, pp. 2-3. The Commissioner, perhaps seeing no possibility of salvaging this portion of the ALJ's decision, ignores this point completely. Commissioner's

Response Brief, Dkt. #20, pp. 4-6. The undersigned agrees with Wilde on this point. The hypotheticals posed by the ALJ here, and his decision, bear remarkable resemblance to the ALJ's actions in *Banks v. Colvin*, 547 Fed. Appx. 899, 904 (10th Cir. 2013) (unpublished). In *Banks*, the court noted that the ALJ did not make the inquiries required by *Winfrey*, but instead simply accepted the opinion of the vocational expert (the "VE") that someone with the claimant's RFC could meet the demands of her previous relevant work. *Id.* That is exactly what the ALJ did in the present case. (R. 28, 74-76).

Because the ALJ made alternative findings at Step Five, this does not end the inquiry. *Best-Willie v. Colvin*, 514 Fed. Appx. 728, 738 (10th Cir. 2013) (unpublished) (any error at Step Four would be harmless given ALJ's Step Five finding). Turning to the Step Five finding, Wilde first argues that she should be considered disabled under Rule 201.08 or 201.06 of the "Grids," the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.. Plaintiff's Opening Brief, Dkt. #19, p. 4.[5] The undersigned has reviewed Rules 201.08 and 201.06, and they both apply to claimants of "advanced age," meaning age 55 or older. *Id. See also Mendez v. Colvin*, 2013 WL 6858731 *12-13 (D. Colo.). As Wilde points out, she was 52 years old at her date last insured. The undersigned finds it bewildering that Wilde raises an argument that does not apply to her age group.

---

[5] The Commissioner also ignored this argument in her brief. Commissioner's Response Brief, Dkt. #20. As the Tenth Circuit has noted, "[a] party's failure to cite any authority 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'" *Flores v. Astrue*, 246 Fed. Appx. 540, 543 (10th Cir. 2007) (unpublished), *quoting Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970). The undersigned did do the Commissioner's research on this point in Wilde's case, but expects that the Commissioner will thoroughly address all points made by claimants in future briefing.

Wilde's second argument at Step Five is that she could not perform the one light job identified by the VE because the ALJ should have limited her in the RFC determination to lifting less than 20 pounds. Plaintiff's Opening Brief, Dkt. #19, pp. 3-4. Wilde urges that Dr. Al-Shathir, the agency consultant who did the physical examination, limited her to 12.5 pounds. The undersigned disagrees. Dr. Al-Shathir stated that, during the examination, Wilde had been able to "bend and lift 12 ½ pounds from the floor." (R. 281). There is no indication that Dr. Al-Shathir intended this to be a limitation on Wilde's functional capacity, and the undersigned finds that Dr. Al-Shathir's report is not inconsistent with the ALJ's RFC determination that Wilde could lift up to 20 pounds occasionally and 10 pounds frequently. Wilde says that the ALJ "acknowledged the limitation." Plaintiff's Reply Brief, Dkt. #21, p. 2. The ALJ noted the statement, quoted above, included in the report of Dr. Al-Shathir, but the ALJ did not state that he considered this to be a limitation.

Moreover, the undersigned finds that the ALJ's finding regarding Wilde's ability to lift was supported by substantial evidence. While Wilde testified in general about her back pain at the hearing, her testimony about her ability to lift was not extensive. Wilde said that no doctor had restricted how much she should lift or carry. (R. 63). When asked if she could lift a 20-pound bag of dog food, she said "maybe," and she explained that it would make a difference if it was on the floor or on a high shelf. (R. 63-64). From this evidence, the treating evidence, and Dr. Al-Shathir's report, the ALJ was entitled to conclude that Wilde was capable of occasionally lifting up to 20 pounds. Dr. Hastings' report that she should be limited to lifting eight pounds does not require a different result on this point, because it does not negate the substantial evidence supporting this particular aspect of the ALJ's decision.

Wilde invokes Dr. Hastings' report regarding her next argument, which is that there should have been a more restrictive limitation on handling included in the RFC determination. The ALJ stated in his RFC determination that Wilde "had a slight limitation in fingering, feeling, and gripping such that she should not be doing extensive amounts of small, tedious tasks with her hands, such as working with very small nuts and bolts." (R. 22). With this limitation, the VE identified a light and a sedentary job that could be performed. (R. 75-79). Wilde cites to Dr. Hastings' limitation that Wilde should "[a]void repetitive activities of grasping, fingering and assembly line type duties." (R. 404). Wilde says that Dr. Hastings' limitation would preclude the two jobs identified by the VE which require frequent handling and fingering. Again, the Commissioner fails to address this argument, other than to state that Wilde's claim of disabling weak grip strength is not supported by the record as a whole, with no citation to authority. The undersigned expects more thorough briefing from the Commissioner in the future.

As was true regarding the discussion of the lifting restriction imposed by the ALJ in the RFC determination, the ALJ's handling limitation is supported by substantial evidence. Wilde testified that she had pain in her hands, but it was "not like my back." (R. 55). She said that her problems with her hands were "probably just part of getting old. But they're uncomfortable and they don't work real well for several hours in the morning." (R. 59). In response to a hypothetical question regarding whether she could pick up poker chips, Wilde said that she thought she would be able to pick them up. *Id.* Wilde did not mention any problem with her hands to agency consultant Dr. Al-Shathir, and he noted no abnormalities on examination. (R. 281). He stated that Wilde had "no active or chronic inflammatory joint disease" in either her arms or legs. *Id.* He found that Wilde could reach, reach above her head, and manipulate objects in her hands. *Id.* This is all substantial evidence that supports the ALJ's very specific limitation regarding Wilde's

use of her hands. Dr. Hastings' opinion of a more restrictive limitation does not alter the substantial evidence supporting the ALJ's decision.

Finally, Wilde's counsel includes an argument that is present in almost all briefs from this firm in which an agency consultant or an ALJ has found, as part of the consideration of the Paragraph B Criteria, that a claimant has moderate difficulties in concentration, persistence, and pace. Plaintiff's Opening Brief, Dkt. #19, pp. 4-5. Here, at Step Three, the ALJ made such a moderate finding. (R. 21-22). In his RFC determination, the ALJ restricted Wilde to "only simple, repetitive, routine work." (R. 22). The undersigned rejects, once again, the argument by counsel that the ALJ was required by his "moderate" finding in the Paragraph B Criteria to include more mental functional capacity limitations in his RFC determination. The Tenth Circuit has rejected this argument. *See, e.g., Lull v. Colvin,* 535 Fed. Appx. 683, 685-86 (10th Cir. 2013) (unpublished) (describing counsel's argument as "without merit"; *Chrismon v. Colvin*, 531 Fed. Appx. 893, 897-98 (10th Cir. 2013) (unpublished) (describing counsel's argument as "meritless"). The undersigned has rejected this argument with full explanation on multiple occasions, and the undersigned advises counsel to re-read *Lull, Chrismon* and these decisions and to cease repeating this meritless argument.[6] *See McCaskill v. Colvin*, 2013 WL 1961771 *7 (N.D. Okla.); *Ward v. Astrue*, 2012 WL 5830539 *8 (N.D. Okla.).

---

[6] *Lull* and *Chrismon* were decided in 2013, and Plaintiff's Opening Brief was filed April 2, 2014. *Lull* and *Chrismon* were unpublished and therefore are "not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A). If counsel disregards the advice of the undersigned to cease making this argument, all future briefs that make an argument based on Paragraph B Criteria should include some explanation of why *Lull* and *Chrismon* are distinct or not applicable.

The ALJ's Step Four finding does not comply with legal requirements. However, the ALJ's RFC determination and his Step Five finding are supported by substantial evidence, and they complied with legal requirements. The undersigned therefore recommends that the ALJ's decision be affirmed.

**Consideration of Medical and Nonmedical Opinion Evidence**

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). *See also* 20 C.F.R. § 404.1527(c)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* An ALJ is required to discuss all opinion evidence and to explain what weight he gives it. *Id.* "Regardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. 404.1527(c).

Wilde begins this section of her brief with an argument that the ALJ failed to properly consider the opinion of her treating physician, Dr. Tiemann. Plaintiff's Opening Brief, Dkt. #19, pp. 5-6. On a Cherokee Nation form dated October 31, 2011, Dr. Tiemann wrote that Wilde had degenerative disc disease of the lumbar spine and that she needed a neurosurgical evaluation. (R. 387). Dr. Tiemann circled responses stating that this condition prevented Wilde from working,

that it could not be controlled by medication, and that Wilde was not able to work. *Id.* He said

that Wilde would be unable to work for the remainder of her life unless she was seen by a

neurosurgeon, and he circled a response stating that she had no current work tolerance. *Id.* Dr.

Tiemann also signed a handicapped parking placard application for Wilde, checking a box that

she could not walk 200 feet without stopping to rest. (R. 389).

After reviewing Wilde's objective medical evidence, the ALJ stated that he had carefully

considered the two forms signed by Dr. Tiemann. (R. 26). The ALJ said that he gave Dr.

Tiemann's opinion:

> little weight, because the degree of limitation he assessed is unsupported by the
> medical evidence of record, including his own treating notes which found no
> deficit to gait or station or findings of limited ability to walk. Additionally, as
> discussed above, the claimant was examined by a neurosurgeon, and had a normal
> examination. He indicated no need for neurosurgical management.

*Id.*

Wilde argues that the ALJ did not follow the required two-step analysis and did not

adequately discuss the required factors set out in regulations. *Krauser v. Astrue*, 638 F.3d 1324,

1330-32 (10th Cir. 2011); 20 C.F.R. § 404.1527. In a recent case, the Tenth Circuit rejected an

argument that the ALJ had not sufficiently discussed treating physician opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not
> adequately evaluate and discuss the medical-source evidence. Where, as here, we
> can follow the adjudicator's reasoning in conducting our review, and can determine
> that correct legal standards have been applied, merely technical omissions in the
> ALJ's reasoning do not dictate reversal.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012). The court also said that

"common sense, not technical perfection, is [the] guide" of a reviewing court and that "[t]he more

comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical

perfection." *Id.,* at 1166; *see also Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009)

(unpublished) (while "it would have been helpful if the ALJ had elaborated" on his analysis of opinion evidence, the ALJ's decision was adequate).

Here, the ALJ made his reasoning clear by stating that the degree of limitation reflected in Dr. Tiemann's opinion was not supported by medical evidence. (R. 26). He pointed out that Dr. Tiemann had never noted problems with Wilde's gait or ability to walk in his treatment notes. The ALJ noted that the neurosurgical consultation was an essentially normal[7] examination. The ALJ's reasoning is clear: that someone with the degree of limitation described in the two forms signed by Dr. Tiemann would be expected to have objective medical examination findings that corresponded with that degree of limitation.

Wilde counters the ALJ's reasoning primarily with evidence of her subjective complaints of insomnia, fatigue, and pain. Plaintiff's Opening Brief, Dkt. #19, p. 7. Subjective complaints in this instance are not evidence that undermines the ALJ's finding that Dr. Tiemann's opinion was not supported by objective medical findings. The ALJ was not required to find that Wilde's subjective complaints were fully credible, and he made a supported credibility assessment, as discussed below. Therefore, Wilde's argument that Dr. Tiemann's opinion was "corroborated" by subjective complaints is not availing. *See, e.g., Sawyer v. Barnhart*, 89 Fed. Appx. 148, 151-52 (10th Cir. 2004) (unpublished) (affirming ALJ's rejection of family doctor's opinion in part due to "the limited back treatment provided by [the treating physician] and her cursory treatment notes"); *Calhoun v. Barnhart*, 85 Fed. Appx. 678, 685 (10th Cir. 2003) (unpublished) (affirming rejection

_____

[7] The ALJ said that Wilde was examined by the neurosurgeon and "had a normal examination." (R. 26). Wilde complains that this description is inaccurate because she had pain "on maximum flexion" of her low back. (R. 253). The undersigned agrees that the ALJ's description is not precisely accurate, but this mistake is not so great as to undermine confidence in the ALJ's decision. *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993)

of treating physician opinion when his treatment of the claimant was limited to recording her subjective complaints and prescribing medication).

At this point, Wilde's brief deteriorates into assertions that do not constitute cogent arguments. Wilde raises the specter of the ALJ's inadequate analysis of Dr. Hoyer's consultative mental status examination. Plaintiff's Opening Brief, Dkt. #19, p. 7. She states that the ALJ failed to explain why he gave Dr. Hoyer's report "great weight," but in fact the ALJ explicitly stated that he did so because "it is well supported by the medical evidence of record, including [Dr. Hoyer's] own examination of [Wilde]." (R. 26). Wilde then states that in addition to omitting some details of Dr. Hoyer's examination, "the ALJ ignored that he must give explicit reasons for rejecting the report." Plaintiff's Opening Brief, Dkt. #19, p. 7. The undersigned is confused by this sentence, because the ALJ obviously did not reject Dr. Hoyer's report. Instead, the ALJ cited to Dr. Hoyer's report as one of his reasons for assigning Wilde with "moderate" difficulties with regard to concentration, persistence, or pace, and he then, in his RFC determination, restricted Wilde to perform "only simple, repetitive, routine work." (R. 21-22). Thus, the ALJ accommodated the findings of Dr. Hoyer which he gave "great weight." Wilde's arguments that the ALJ made some error with respect to Dr. Hoyer's report are unpersuasive.

Wilde then makes a two-sentence argument that the ALJ did not adequately address the report of Dr. Al-Shathir. To the extent that this argument repeats the contention that Dr. Al-Shathir intended to limit Wilde to lifting only 12.5 pounds occasionally, the undersigned has already explained that the language used by Dr. Shathir does not support that this was a limitation. To the extent that Wilde is making a different or enlarged argument, it is not sufficiently

developed to allow meaningful review, and it is therefore waived.[8]  *Wall*, 561 F.3d at 1066;

*Keyes-Zachary*, 695 F.3d at 1161 (declining to consider poorly developed sub-issues);  *Miller v.*

*Astrue*, 496 Fed. Appx. 853, 855 (10th Cir. 2012) (unpublished).

Wilde then criticizes the ALJ's discussion of a third party function report submitted to the

agency by her sister, Ms. Gess.  Plaintiff's Opening Brief, Dkt. #19, p. 8.  The ALJ discussed Ms.

Gess' report and noted that she was not entirely sure of changes to Wilde's daily routines.  (R. 26-

27).  He said that a lay person could not determine if observed behaviors were "medically

compelled," and he said that the objective medical findings outweighed Ms. Gess' opinion for

purposes of assessing Wilde's credibility.  The undersigned finds this discussion and analysis to

be adequate.  *See Zumwalt v. Astrue*, 220 Fed. Appx. 770, 780 (10th Cir. 2007) (unpublished)

(LPC was not an acceptable medical source, and ALJ's treatment of her evidence was sufficient);

*Lundgren v. Colvin*, 512 Fed. Appx. 875, (10th Cir. 2013) ( unpublished) (explanation of weight

given to LPC opinion was sufficient because it permitted reviewing court to follow the

adjudicator's reasoning), *quoting Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012)

(further quotations omitted).

Because the ALJ's discussion and analysis of the medical and nonmedical opinion

evidence complied with legal requirements, the undersigned recommends that the ALJ's decision

be affirmed.

---

[8] In this same paragraph, Wilde mentions Dr. Hastings' report and notes that the ALJ did
not have an opportunity to weigh his opinion evidence.  Plaintiff's Opening Brief, Dkt. #19, p. 8.
If this observation was intended to be a point of argument, it is not sufficiently developed and is
therefore waived.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary*, 695 F.3d at 1167.

The undersigned is convinced that the ALJ's findings here are "closely enough linked to the evidence to pass muster." *Keyes-Zachary*, 695 F.3d at 1172. After the introductory paragraph stating that he found claimant's statements not credible to the extent that they were inconsistent with his RFC determination, the ALJ discussed the treating medical evidence in some detail. (R. 24-26). While it would have made the Court's task easier if the ALJ had linked the evidence to credibility in a more direct way, the ALJ made his reasoning clear. *Keyes-Zachary*, 695 F.3d at 1166 ( "[t]he more comprehensive the ALJ's explanation [for weight given opinion evidence], the easier our task"). The ALJ gave several reasons for finding Wilde's claims to be less than fully credible. (R. 26). He said that there were discrepancies between her claims and her reported symptoms to physicians, the objective medical findings, the conservative treatment prescribed, and her reported response to the treatment. *Id.*

While he should have made the links between these specific reasons and the evidence more explicit, the undersigned finds the ALJ's discussion to be adequate. In one paragraph, he gave examples of objective findings that were inconsistent with a claim of total disability. (R.

25).  He explained that some objective findings, such as straight leg raising or lumbar tenderness to palpation, were only made intermittently on physical examination.  *Id.*  He explained that Wilde had no other range of motion limitations on examination, and her gait was normal.  *Id.*  She was neurologically intact with no sensory defect.  *Id.*  On examination, Wilde's hands had normal function, with no findings of limited range of motion.  *Id.*  A finding that subjective complaints are inconsistent with objective medical evidence is a legitimate reason that supports an adverse credibility assessment.  *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013).

The ALJ also discussed the consultative mental status examination in some detail, and he noted that Wilde's testimony as to memory problems was not entirely supported by the testing done by the consultative examiner.  (R. 25-26).  Nevertheless, he found that the evidence supported a finding that Wilde was limited to simple, repetitive, routine work.  *Id.*  The ALJ's discussion here was another example of contrasting Wilde's allegations with the objective medical evidence, and it also supports his finding that Wilde was less than fully credible.

Regarding Wilde's conservative treatment, the ALJ discussed the evaluation by the neurosurgeon in November 2009.  (R. 24, 26).  The neurosurgeon's examination was almost totally normal, with a finding of pain only on "maximum flexion" of the lumbar spine.  (R. 24).  The neurosurgeon noted the "unclear etiology" of her pain and found no indication that neurosurgical management was needed.  (R. 24, 26).  Thus, the ALJ's specific reason of conservative treatment was supported by this evidence.  *See Best-Willie*, 514 Fed. Appx. at 735-36 (approving conservative treatment as one factor supporting adverse credibility assessment); *Holbrook v. Colvin*, 521 Fed. Appx. 658, 664 (10th Cir. 2013) (unpublished) (same); *Mayberry v. Astrue*, 461 Fed. Appx. 705, 711 (10th Cir. 2012) (unpublished) (same).

In her response to the ALJ's credibility assessment, Wilde at one point mentions Dr. Hastings' report and its objective medical findings, stating that she "clearly has positive clinical signs and neurological findings, even if they appeared late." Plaintiff's Opening Brief, Dkt. #19, p. 10. This point does not undermine the ALJ's reasoning, because he noted that some examinations did have objective findings, but those findings appeared intermittently throughout the relevant time period. Thus, the fact that Wilde had some objective findings in a 2012 examination does not affect the fact that there were only intermittent findings during the relevant period of January 1, 2008 through June 30, 2011.

Wilde makes other scattershot arguments attacking the ALJ's credibility assessment, but none of them truly undermine the specific and legitimate reasons discussed above. For example, Wilde faults some language the ALJ included in his decision that severe pain "will often result in certain observable manifestations," including loss of weight due to loss of appetite from incessant pain. (R. 28). Wilde attacks this with the following statement: "The ALJ found [Wilde] was not credible because she did not lose a sufficient amount of weight for him to consider her credible." Plaintiff's Opening Brief, Dkt. #19, p. 9. The undersigned is not reaching the question of whether the ALJ's full statement regarding "observable manifestations" is acceptable, but Wilde's characterization of it is patently false. A ruling on this particular language of the ALJ's decision is not necessary, however, because the ALJ gave the specific and legitimate reasons supported by substantial evidence that were discussed above, and this language, even if unacceptable, does not affect those reasons. Other criticisms of Wilde also fall into this category, because even if they are valid, a question not reached by the undersigned, they simply do not affect the legitimacy of some of the reasons given by the ALJ for his adverse credibility assessment.

Finally, Wilde says that the ALJ should have credited her positive work history. Plaintiff's Opening Brief, Dkt. #19, p. 12. She also asserts that the ALJ should have noted that Wilde was uncomfortable and needed to walk around both at her mental consultative examination and at the hearing. *Id.* These two assertions are unpersuasive in that the evidence is not of such significance that it affects the validity of the ALJ's credibility assessment. *See Harper v. Colvin*, 528 Fed. Appx. 987, 892 (10th Cir. 2013) (unpublished) (declining to reweigh evidence when the claimant listed "pieces of evidence" ALJ did not include in his credibility analysis); *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished) (rejecting argument that ALJ's credibility assessment was flawed because he "ignored certain pieces of favorable evidence").

The ALJ's credibility assessment was sufficient, and the undersigned therefore recommends that the ALJ's decision be affirmed.

## Conclusion

The ALJ's decision is supported by substantial evidence and complies with legal requirements. Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED.**

## Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by August 21, 2014. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm

waiver rule"). *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 7th day of August 2014.

_____
Paul J. Cleary
United States Magistrate Judge